# NATIONAL LABOR RELATIONS BOARD v. GENERAL MOTORS CORPORATION.

## No. 7272.

Circuit Court of Appeals, Seventh Circuit.

Dec. 12, 1940.

Garnet L. Patterson, of Seattle, Wash. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolf, Morris P. Glushien, and William F. Guffey, Jr., all of Washington, D. C., on the brief), for National Labor Relations Board.

Ernest S. Ballard, Ralph Bowers, and Merrill Shepard, all of Chicago, Ill., for respondent.

Before EVANS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Upon charges filed with it, the National Labor Relations Board issued a complaint against respondent, February 8, 1938, in the form prescribed by Section 10 (b) of the Act, 29 U.S.C.A. § 160 (b), and after hearing, an order was entered which it is now here seeking to enforce.

In addition to jurisdictional allegations, the complaint charges the employer with certain unfair labor practices at its Delco-Remy plant, in violation of Section 8 (1), (2), (3) and Section 9 of the Act, 29 U.S.C.A. §§ 158 (1–3), 159.

These practices consisted of: (1) attempting to discourage membership of its employees in the Union by threats of violence and discharge and other reprisals, the use of labor spies, encouraging mob violence against the Union and its members, lock-outs, and the refusal to re-employ or reinstate members of the Union after the lockout; (2) dominating, assisting, and interfering with the formation and administration of an employees' association (called hereafter, "DREA").

Respondent filed its answer in which it admitted certain jurisdictional allegations, but denied that it had committed any of the unfair labor practices alleged. It asserted that the filing of charges by the unions, with the Board, was in direct violation of a series of agreements entered into between respondent and the International Union, dated February 11, 1937, March 12, 1937, and June 4, 1937, respectively. It was also alleged that because of these agreements, and especially because of the last agreement, the issuance of the complaint by the Board constituted an unwarranted and unlawful interference with the rights of the parties to the agreement.

Motions to dismiss the complaint were filed by respondent. Thereafter, upon due notice, a hearing was held, which continued from February 21, 1938, to March 17, 1938. Upon its motion, the DREA was granted leave to intervene.

The Examiner filed his intermediate report, and the respondent and intervenor filed exceptions thereto. Oral argument was had before the Board, in which both respondent, and the intervenor participated.

On August 2, 1939, the Board announced its decision. It made findings of fact and conclusions of law, and entered the order now the subject of these proceedings. (See 14 N. L. R. B. 113.) The order called upon respondent to cease and desist from: (1) dominating and interfering with the administration of the DREA or any other labor organization of its employees, and contributing financial support thereto; (2) recognizing the DREA as the representative of any of its employees at the plant for the purposes of collective bargaining; (3) maintaining surveillance of any of its employees for the purpose of investigating the activities of the Union; (4) in any manner interfering with or coercing its employees in the exercise of their right to self-organization.

It also ordered the respondent to take the following affirmative action: (1) withdraw all recognition from the DREA as the bargaining representative of any of its employees; (2) afford to all of its employees reasonable protection at all times from physical assaults or threats of violence against the United or any of its members; (3) instruct its employees that assaults or threats of physical violence would not be tolerated in its plant when directed against the activities of the Union or any of its members, and to further instruct them that black jacks and other dangerous weapons could not be carried by employees except upon express authority from the respondent; (4) post appropriate notices to the effect that this order would be obeyed.

The Board dismissed the charges that respondent locked out its employees at the Delco-Remy Plant or encouraged the Citizen's League for the Industrial Security of Anderson to use mob violence against the Union.

The questions before us are: (1) Is the Act applicable to the respondent? (2) Are the Board's findings of fact supported by substantial evidence? (3) Is the order of the Board requiring respondent to provide reasonable protection for its employees from physical assaults and threats of violence, proper? (4) Did the agreement of June 4, 1937, between the respondent and the International Union preclude the Board from issuing its complaint?

*Jurisdiction of the Board.* The evidence conclusively established the existence of facts which gave the Board jurisdiction of this labor dispute. The findings support the Board's jurisdiction and the evi-

dence supports the findings. So clear is the evidence on this issue that we are convinced that a discussion of it is unnecessary. The undisputed facts bring the case within the holdings of the court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

*Unfair Labor Practices.* Shortly after the inauguration of the National Industrial Recovery Act, 48 Stat. 195, the Delco-Remy Corporation decided to effectuate some sort of employees' association. Certain employees were chosen by the management to become employee representatives, or councilmen, of the new organization. Representatives were picked from each department, or local "plant," and these met in general councils, and the organization was to be known as the "Delco-Remy Employees' Association." Meetings of the councilmen were held during working hours in a room provided for them by the company. At the first meeting, the supervisor explained to the men what the management had in mind. It wanted them to organize.

About a week later, a second meeting was held, also during working hours. This time a much larger group of representatives attended, and several company officials were also present. Organization was perfected, and shortly thereafter a plant-wide election was held at which permanent officers and representatives were elected. There is some evidence that pressure was put on all employees to vote, and none-too subtle threats of discharge were made to those who showed reluctance. One man was discharged when he refused to serve as an officer of the Association after having been elected. During the summer of 1933, a union affiliated with the American Federation of Labor attempted to organize the men. The attempt proved futile, and, after the formation of the Association, other union activities ceased.

The Association thereafter continued to function, with only employees occupying non-supervisory positions eligible for membership therein. Officers were elected yearly. Besides directing certain social events, it was the duty of the Association to hear complaints and make reports thereon. Machinery was also provided in the Articles of Association, adopted in August, 1934, for the representatives and officers to "make a complaint, recommendation, or suggestion * * * with reference to wages, hours of labor, working conditions, or any other appropriate subject" and also "to make application for any welfare benefits which may be provided" and "to enjoy the benefits of group insurance and savings plans."

Since no dues were collected, necessary expenses of the Association for such things as stationery, printing ballots, copies of the Articles of Association, and other things, were borne by the Company. Plant facilities, such as bulletin boards for Association notices, stenographic and clerical assistance, and meeting rooms were also furnished by the Company.

Under substantially this arrangement the Association continued for nearly two years. After the passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Association distributed to all employees a bulletin which stated that "By authority of the above sections, we can maintain our present organization * * * providing: 1. We hold an election on our own time * * *. 2. We finance our own printing of ballots, hand bills, such as these, and all other incidental expense."

Thereafter, revised Articles of Association were adopted. Two important changes were made. The first provided for a finance committee, whose duty was "to suggest and devise ways and means to finance this Association * * *." The other change was the addition of procedure for collective bargaining, in which the General Council of the Association was empowered to negotiate with the management on all questions of wages, hours of work, conditions of labor, and other kindred subjects. Since no provisions were yet made for the collection of dues, the Finance Committee had to devise other means of raising money. The holding of dances, baseball games, shows, and benefits, were the usual methods devised.

Until February, 1937, the Association continued to operate according to plan. All of its books and records were stored in company rooms; meetings and elections were held on company property. Asso-

ciation officers attended to business during working hours without suffering any deductions from their pay.

The evidence points rather strongly to the conclusion that the Association was company-dominated, docile, and meek. When a complaint was filed by it, there was no action taken, and at least one of its officers, when presenting an older workingmen's group's complaint was told, "Now, you could stop stuff like this out there." He dropped the complaint.

Employees were notified on January third, 1937, that the plant would be closed temporarily while an inventory was taken. Two days later all employees received, by mail, a printed statement prepared by Alfred Sloan, Jr., President of General Motors. This statement was prefaced by a statement signed by Kroeger, General Manager of Employer. Therein it was said:

"* * * That real issue is perfectly clear, and here it is:

"Will a labor organization run the plants of General Motors Corporation or will the Management continue to do so? On this issue depends the question as to whether you have to have a union card to hold a job, or whether your job will depend in the future, as it has in the past, upon your own individual merit. In other words, will you pay to a private group of labor dictators for the privilege of working, or will you have the right to work as you may desire. Wages, working conditions, honest collective bargaining, have little, if anything, to do with the underlying situation. They are simply a smoke screen to cover the real objective.

"Now, you are entitled to know what General Motors' position is. That is the real purpose of this message to you. Here it is:

"1. General Motors will not recognize any union as the sole bargaining agency for its workers, to the exclusion of all others. General Motors will continue to recognize, for the purpose of collective bargaining, the representatives of its workers, whether union or nonunion."

The statement was made at a time the United was actively engaged in a membership campaign at the plant. Many of the men were active in this campaign. Following the appearance of Sloan's statement, the struggle became acute. Feeling ran high. Enemies of the United blamed it for the shut-down. "Back-to-work" movements were initiated by some of the employees. About seven thousand of them signed cards to the effect that they were willing to return to work. Fear was expressed that a sit-down strike was imminent. The record is barren of any proof that the United, at any time, contemplated calling a strike at the plant.

The plant re-opened January 18, 1937, with an additional force of special-duty police (the regular force consisted of fifty-seven uniformed men). These, one hundred in number, were picked from the ranks of the employees. They wore no uniforms, but were identified by an arm band, and were equipped with black jacks. Some of them had been active in the Association and the "back-to-work" movement. Primarily, the duties of these police were to keep the peace and to collect passes at the gates. No United members were put on this force.

Up until January 25, 1937, there were no disturbances in the plant. The atmosphere was strained, but order was maintained. On the evening of that date, the United was to have a meeting at the Anderson court-house. Anti-unionists met nearby, and, marching on the court-house, attacked the union men. Their meeting was broken up, and some of the Union men were severely beaten. One of them, Moore, testified that, in the mob which attacked him, he recognized several foremen, assistant foremen, and representatives of the DREA.

After the United meeting was broken up, Union headquarters were destroyed, and the mob moved on to the Guide Lamp plant of General Motors (also in Anderson) where the United had a picket line. The line was broken up and the pickets scattered. Their shack was burned down. There is evidence that one of respondent's foremen, Gammon, was seen to be taking an active part in organizing this mob. Kroeger, Bagley, the Assistant Manager, and other company officials, were spectators.

Starting the following day, the anti-unionists began the practice of evicting United members from the plant. The record is replete with testimony concerning individual instances in which this was done without any effort being made by the management or the plant police to stop it. Those evicted were told not to come back until they had renounced their allegiance

to the United. In one case, on January 28th, a rumor spread through the plant that some C. I. O. organizers were coming to Anderson on the train. A large group of employees immediately left the plant to "meet the train." The rumor proved to be untrue, but the men were gone for over an hour. No attempt was ever made to stop them, nor were deductions made in their wages for the time lost. Since all employees were forced to show their passes in order to re-enter the plant, respondent's claim that it was impossible to identify the guilty parties, is ill-founded.

Respondent seeks to justify this policy on the ground that to interfere with the men would have been to cause further excesses and more violence. This, however, fails to explain away the fact that the record also shows that foremen, assistant foremen, and others occupying a supervisory capacity, sometimes directly participated in the evictions.

An illustration of this was given by an employee, Swigart, who testified that his foreman, Jarrett, called him, together with several other employees, to his desk. Jarrett explained that, "You realize what we are up against here. * * * You know that there is going to be a fellow come in to work in another night or two, and, now, just kind of leave it up to you fellows to go to him and talk to him and tell him that you would rather not work with him unless he would tear up his card and be with us, and if he don't want to do that, why I will be out of sight and Mack (a group leader) won't be around." "The way will be clear, and the gate will be open and nobody will stop you." In all, over ninety United members were evicted before the management ordered further evictions to cease.

In the middle of February, 1937, four employees of the Company, including Shelton, Chairman of the Association, met to discuss the formation of a new organization. Shelton expressed the opinion that the Association had been abandoned by its officers and the Company. It could no longer hold its meetings on company property, or store its records in company vaults. It was, therefore, decided to organize a new Union. On the advice of a local attorney, it was decided to call the new organization by the same name, Delco-Remy Employees' Association, or DR-EA. By-laws were prepared by the attorney, and two hundred dollars was borrowed by him from a local bank to launch the organization. A meeting room was rented in the Athletic Club. On March 3, 1937, a general mass meeting was held in which about three hundred plant employees were present. Shelton was there elected temporary Chairman, the by-laws were adopted, and membership applications circulated. About two hundred were signed up that same evening.

Internal organization being perfected, permanent officers were elected, and regular meetings held. Dues were one dollar per year, and, by May 4, 1937, seven thousand two hundred members had been enrolled, out of some eight thousand employees at the plant.

On March 12, 1937, General Motors had entered into a bargaining contract with the United Automotive Workers of America at Detroit. The Company agreed to recognize the Union (Local 146) as the bargaining representative for its members at the Delco-Remy plant. Recognition was denied the DREA by Kroeger, when it sought a contract, although it was permitted to bargain for its members. The DREA, contending that it had a majority of the employees as its members, demanded a closed shop contract, or rather, to be recognized as the sole bargaining representative at the plant.

Thereupon, the DREA officers went to see the Regional Director of the National Labor Relations Board, and to ask for his advice. The Regional Director suggested that the DREA obtain the refusal in writing. Kroeger was, consequently, again approached. He again denied recognition. Finally, a petition seeking an election and a certification by the Board was filed by the DREA. Shortly thereafter, Knudsen, President of General Motors, agreed to so recognize the DREA if the proper certification were secured from the Board.

In an effort to obtain action on its petition by the Board, the DREA, through its officers and others, organized the National Independent Unions of America. This union was incorporated July 19, 1937, and the DREA became its Local No. 1, August 3, 1937. At the time of the hearing, eight other local independent unions had become affiliated with the National, and other petitions for affiliation were pending. The National acted merely as

an advisor for the locals, and published a newspaper for them.

Nevertheless, the Board did not act upon the DREA petition up to the time of the hearing, nor has the Company recognized it as the sole bargaining representative at the Delco-Remy plant.

■ The foregoing statement of the evidence, and much more that might be set forth, strongly supports the Board's finding of unfair labor practices. In fact, the evidence is most convincing that the employer dominated or interfered with the association and the administration of its affairs. It contributed support to it and thus violated Section 8 (1), (2) of the Act. Also, it was established by evidence most satisfactory—a part of which was in writing—that for some seven years it hired operators to spy upon the union activities of its employees. The employer also sought through threats and by violence to intimidate its employees, and by printed literature distributed among the workers, attempted to coerce them into keeping out of union activities engaged in at the time.

This leads to the conclusion that the order of the Board must be sustained unless, (a) it went too far, or (b) it was defeated by the action of the Company and the representatives of United, wherein it was agreed between respondent and International Union that all cases pending before the National Labor Relations Board should be withdrawn. Respondent contends that this agreement governs.

■ *Respondent Is to Maintain Reasonable Protection for Its Employees.* Respondent argues that the order is too broad and goes too far when it directs it to "afford all its employees reasonable protection * * * at all times from physical assaults or threats of physical violence directed at discouraging membership * * * (in unions)".

The part of the order complained of merely calls upon the respondent to cease and desist from the unfair labor practices found—its interference with, and the coercion or the intimidation of its employees in the exercise of their right of self-organization.

■ Respondent also contends that this part of the order (2 (b) (c) ) is "indefinite and therefore fatally defective." The "reasonable" protection required by the order will be given when respondent maintains order and discipline characteristic of a well-run manufacturing plant, and, in good faith, takes the position that its employees may freely choose their bargaining agent. The term, "reasonable" is somewhat relative but not so uncertain that respondent can not comply with the Board's order.

*Effect of Agreement Between Respondent and the International.* On February 11, 1937, an agreement was entered into between General Motors and the International Union in which the former recognized the latter as the collective bargaining agency for its employees who were members of the Union. Negotiations were to be continued over the terms of a contract.

Following this agreement, a supplemental agreement was signed by the parties on March 11, 1937, in which was incorporated procedure for the settlement of grievances of the employees. General provisions containing a statement of policy by the Company were also incorporated. In turn, it was agreed that there would be "no suspension or stoppage of work until every effort has been exhausted to adjust * * * (grievances) through regular grievance procedure, and in no case without the approval of the International officers of the Union."

Then, on June 4, 1937, a document worded as follows was signed by the President and Vice-President of the International Union:

"Meetings have been held for the purpose of arriving at a mutually satisfactory solution of all cases of alleged discrimination that have been submitted to General Motors Corporation or any of its Divisions or cases submitted to the National Labor Relations Board at any point in the United States by the Union or any of its members and the final settlement of any such cases occurring prior to this date.

"In consideration of the mutual understandings arrived at regarding all former employees who are or were members of the International Union, United Automobile Workers of America, having been satisfactorily adjusted to the complete satisfaction of the International Union, United Automobile Workers of America, it is agreed that any and all cases pending before the National Labor Relations Board shall be withdrawn; also that no further claims of alleged discrimination

of any kind will be presented to the said National Labor Relations Board or to the General Motors Corporation, its divisions or subsidiaries, for alleged discrimination against the union or any of its members occurring prior to this date by the Union or any of its members.

"International Union, United Automobile Workers of America,
"(Signed)    Homer Martin,
"*President.*
"(Signed)    Ed Hall,
"*Vice-President.*
"Dated June 4, 1937."

Thereafter, on July 24, 1937, the International Representative of the UAWA filed the charges with the Board, and an amended charge was filed February 5, 1938, by Local No. 146.

Respondent contends in its answer and argued in support of its motion to dismiss the complaint, that the Board was without power to maintain the instant proceeding. It is argued that the proceeding is an unwarranted interference with the right of contract of the respondent and its employees who are members of Local No. 146, and deprives them of the fruits of their collective bargaining contract, and further, that the charges were not filed in good faith.

Because of the public interest in labor disputes Congress has acted. It has provided for a Board which has been appointed. Its powers are fixed by the Act which created it. Section 10 (a) of the Act reads:

"The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

Agreements not to bring suit under certain circumstances have been generally upheld in the courts where the controversy is between private parties and affects their private rights only. But the controversy here is between the Federal government on one hand, represented by the Board, and the respondent-employer on the other hand. The controversy is not to vindicate a private right, but to give effect to the public policy as defined by Congress, viz: the prevention of unfair labor practices which, by causing and increasing industrial strife, obstruct the free flow of interstate commerce. Amalgamated Utility Workers v. Edison Co., 309 U.S. 261, 266, 267, 268, 60 S.Ct. 561, 84 L.Ed. 738.

The above-quoted section plainly indicates that the jurisdiction of the Board, once established in all other respects, is not to be affected by an agreement entered into by private parties. Amalgamated Utility Workers v. Edison Co., 309 U.S. 261, 264, 267, 269, 60 S.Ct. 561, 84 L.Ed. 738. The Board might decide, in the exercise of its discretion, not to issue a complaint. In many cases it undoubtedly would not do so. Yet nowhere in the statute is there any limitation on the broad power of the Board to issue its complaint after charges have been filed. It is not a question of power to act but a question of judgment, of discretionary exercise of power clearly and expressly granted to the Board by Congress. Respondent's attack is not upon the wisdom of exercising its power, but is a denial of the existence of the Board's authority.

Another pertinent section (10(b) ) reads,

"Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *."

Our conclusion is that the Board is entitled to an order of enforcement from this court. It is so ordered.