**PROGRESSIVE MINE WORKERS OF AMERICA, INTERNATIONAL UNION v. NATIONAL LABOR RELATIONS BOARD.**

No. 10185.

United States Court of Appeals Seventh Circuit.

Heard Jan. 12, 1951.

Decided Jan. 31, 1951.

As Amended March 20, 1951.

G. William Horsley, Springfield, Ill., for the Labor Union.

Louis J. Portner, St. Louis, Mo., for Randolph Corporation.

David P. Findling, A. Norman Somers and George L. Powell, National Labor Relations Board, George J. Bott, General Counsel, and Frederick U. Reel and Gerald F. Krassa, Attorneys, National Labor Relations Board, all of Washington, D. C., for respondent.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

MAJOR, Chief Judge.

Petitioners are here to review and set aside an order of the respondent National Labor Relations Board (hereinafter referred to as the Board), issued on May 22, 1950, pursuant to Sec. 10(c) of the National Labor Relations Act as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., hereinafter called the Act. The Board in its answer has requested enforcement of its order.

Petitioner Progressive Mine Workers of America is an international Union, divided into a number of districts, the largest of which is petitioner District No. 1. In this district is included petitioner Local Union No. 13, which is the labor organization directly involved in this proceeding. (All of such petitioners will sometimes be referred to as the Unions.) Petitioner Randolph Corporation (hereinafter referred to as the company) was on March 24 and 25, 1948, the dates mainly material to this proceeding, engaged in the mining of coal at Tilden, Illinois. Its employees were members of Local No. 13, which had been designated as the bargaining agent and with which the company had a contract due to expire June 30, 1948. Respondents are the Board and two of the company's employees, Charles Chandler and George W. Smith, who were members of Local No. 13. The unfair labor practices alleged and found against the Unions and the company relate to these two individuals.

The Trial Examiner, after hearing, in his intermediate report concluded that the Unions by restraining and coercing employees Chandler and Smith had engaged in unfair labor practices within the meaning of Sec. 8(b) (1) (A) of the Act. The Examiner concluded that the company had not engaged in unfair labor practices within the meaning of Sec. 8(a) (3) and (1) of the Act, and consequently that the Unions had not engaged in unfair practices within the meaning of Sec. 8(b) (2). The Examiner recommended that the complaint be dismissed as to the company, and the Unions exonerated as to the 8(b) (2) violation.

Upon exceptions to the Examiner's report, the Board made its findings and concluded, contrary to the Trial Examiner, that the "Respondent Company constructively discharged employees Chandler and Smith, in violation of Section 8(a) (3) and, derivatively, 8 (a) (1) of the Act." And as to the Unions, the Board concluded, "As the conduct of the Respondent Unions impelled the discriminatory discharges effected by the Employer, it is clear, and we find, that the Respondent Unions thereby violated Section 8(b) (2) and 8(b) (1) (A) of the Act." The Board also found, as did the Examiner, that the Unions violated Sec. 8 (b) (1) (A), and consequently Sec. 7, because of certain threats attributable to the Unions or their agents calculated to restrain and coerce the two employees, Chandler and Smith. Of the five-member

Board, two members (including the chairman), like the Trial Examiner, exonerated the Unions from a violation of 8(b) (2), based upon the premise that the Unions had impelled the company to discharge Chandler and Smith, and consequently exonerated the company from a violation of 8(a) (3). As the order affected the Unions in other respects, the Board was unanimous.

■■■■ In the beginning, we note the Unions' complaint directed at certain procedural aspects of the case. The Unions contend that the charge contained in the complaint was not made with the Board within six months from the time the alleged unfair labor practices occurred, as required by Sec. 10(b) of the Act. The fact is that the charge filed with the Board by Chandler and Smith was within the six-month period. The argument, however, is that the charge contained in the complaint was different from that made to the Board and, therefore, was not made within the limitation period fixed by the statute. An examination of the charge and the complaint discloses that while the latter was more formal, definite and detailed, it contains substantially the same charge as that made to the Board by Chandler and Smith, and we think the latter was sufficient as a basis for the complaint. It follows that the limitation provision relied upon is not controlling. Complaint is also made by the Unions that the rule invoked by the Trial Examiner for the exclusion of witnesses during the hearing was improperly applied inasmuch as Chandler and Smith were permitted to remain at the hearing while the Unions' officials were excluded. However, the Examiner permitted one representative of the Unions to be present. No showing is made that the Unions were prejudiced by the procedure and we may assume they were not. Moreover, we think the matter was largely within the discretion of the Trial Examiner and, in any event, the action complained of does not affect the legality of the proceeding.

The findings of the Trial Examiner, approved by the Board in support of the charge that the Unions violated Sec. 8(b)

(1) (A) and consequently Sec. 7 of the Act, are as follows:

"Local Union President Todd's statements of March 24, 1948, at the homes of Chandler and Smith, when, according to their credited testimony, he said: 'I'm telling you as a friend not to come out to work in the morning. You fellows are stirring up a hornet's nest. There will be trouble out there: guns, knives, and blackjacks * * * I don't know what all * * * I wouldn't go out if I was you.'

"The threats by pit committeemen Owens and Ramsey to Smith and Chandler at the home of Smith on March 25, where they said: '* * * get away from that mine because we're not going to work with you any more * * *. There will be trouble if you come over them [there].'

"Tidwell's statement at Smith's home 'that the Progressive Mine over there is going to stay progressive as long as I am there, if it takes bloodshed to do it.'

"Board Member Galli's statement to Chandler that the latter 'ain't making these boys no report [about his conference with UMW agents] out here at the mine', and

"Pit committeeman Ramsey's or Owens' statement to Chandler ordering him to change back into street clothes 'because he wasn't going to work there * * * the men wouldn't work with him or Smith.'"

■■■ We think it unnecessary to describe further the official position held by the persons mentioned in these findings because it is admitted that they were all officials of one or the other of the Unions involved and no question is raised but that they were the authorized agents of such Unions. The Board, as did the Trial Examiner, relies almost exclusively upon the testimony of Chandler and Smith in support of the findings thus made. The Union officials who were found to have made these statements did not deny meetings and conversations with Chandler and Smith at the various times indicated. True, their testimony presents quite a different picture as to what was said on those occasions. We see no purpose, however, in entering a discussion as to the numerous contradictions between

the testimony of the officials of the Unions and that of Chandler and Smith. It was the province of the Examiner, and later the Board, to weigh the testimony and decide which version to accept. And it cannot be said that the testimony of Chandler and Smith does not furnish substantial support for the findings as made. In fact, the Trial Examiner who was in the best position to judge of the credibility of the witnesses expressly stated that he was favorably impressed with the testimony of Chandler and Smith.

Neither do we agree with the contention, advanced in rather mild fashion, that the facts found do not constitute a violation by the Unions of Sec. 8(b) (1) (A), which makes it an unfair labor practice for a union or its agents "to restrain or coerce employees in the exercise of the rights guaranteed in section 7." This contention is based on the suggestion that the threats and coercive statements were not regarded by Chandler and Smith with such seriousness as to prevent their return to work. In this connection it is pointed out that Chandler returned to the mine for work on March 25, and voluntarily left to pay a visit to Smith for the purpose of discussing their mutual problem, and that Smith intended to return to work on that date but decided otherwise so that he might attend a veterans' memorial service. It is hardly open to question, however, that threats, intimidation and coercion do not escape the pale of an unfair labor practice because they were not executed or that they did not have the expected or desired result. That has frequently been held under the old Act as it applied to employers and we know of no reason why under the present Act it does not apply with equal force to a labor organization.

We therefore approve the Board's order insofar as it relates to the Unions' violation of Sec. 8(b) (1) (A) and Sec. 7 of the Act. Sec. 8(b) (2) of the Act provides that it shall be an unfair labor practice for a labor organization or its agents "to cause or attempt to cause an employer to discriminate against an employee in vio-

lation of subsection (a) (3) of this section". The conclusion of the Board that the Unions violated this provision evidently is closely related to its conclusion that the company violated Sec. 8(a) (3) "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization". As already noted, this was the sole charge made against the company which was dismissed by the Trial Examiner with the result that the Unions were exonerated of a violation of 8(b) (2), and further as already noted, this action of the Examiner was approved by the two dissenting members of the Board.

This brings us to a consideration of the charge against the company, stated in paragraph 8 of the complaint, as follows:

"Respondent [company] did discharge the employees [Chandler and Smith] * * * and has refused to reinstate them and each of them and did cause the Unions to restrain and coerce them, because of their activity in behalf of and support of United Mine Workers of America * * * and in order to encourage membership in the Progressive Mine Workers of America Local No. 13 * * *, and discourage membership in the United Mine Workers of America."

The Board did not find and it is conceded that there is no proof that the company "did cause the Unions to restrain and coerce them [Chandler and Smith]." And there is neither proof nor finding that the company discharged these two men and, consequently, no proof or finding that it refused to reinstate them. The record leaves no room for dispute but that the company did neither of these acts; in fact, both Chandler and Smith testified that to their knowledge they had not been discharged by the company and that they had never sought reinstatement by the company or made a request or expressed a desire to it that they be permitted to return to work.

The Board's decision, however, is predicated upon the novel theory that the company "constructively discharged employees

Chandler and Smith on March 25, 1948." The Board in its decision stated, " * * * we find that the Respondent Company knew that Chandler and Smith had remained away from work, commencing on or about March 25, 1948, because of the Unions' coercive conduct resulting from the employees' activity on behalf of a rival union. By failing to disavow such expulsion of these employees from the plant by the Unions, we find that the Respondent Company violated Section 8(a) (3) and, derivatively, 8(a) (1) of the Act. As the conduct of the Respondent Unions impelled the discriminatory discharges effected by the Employer, it is clear, and we find, that the Respondent Unions thereby violated Section 8(b) (2) and 8(b) (1) (A) of the Act."

The Board cites many cases in support of its contention that "an employer will be regarded as having constructively discharged employees in violation of Section 8(a) (3) if he *knowingly* permits the ouster of such employees from his plant by any union or antiunion group." A reading of these cases discloses that they furnish feeble, if any, support for the Board's theory of constructive discharge, and certainly they furnish no support for such a theory as applied to the facts of the instant case. To discuss and distinguish such cases would unduly prolong this opinion, but we shall refer to three decisions of this court which are typical of those relied upon. National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984; National Labor Relations Board v. General Motors Corporation, 7 Cir., 116 F.2d 306; Reliance Mfg. Co. v. National Labor Relations Board, 7 Cir., 125 F.2d 311.

In the Greenebaum case the employer actively encouraged the formation of a company union through its general manager and supervisory employees. The organization was formed on company time and in the presence and with the cooperation of the supervisory employees. Three of the officials of the company union told the aggrieved employees that they were discharged. This wrongful act on the part of the union officials took place in the presence of a company official who told the discharged employees he was sorry but that he couldn't do anything about it. Under such circumstances, we sustained the Board's contention that this amounted to a ratification by the company of the wrongful discharges.

True, this court in the General Motors case directed enforcement of the Board's order which required that the company "afford all its employees reasonable protection * * * at all times from physical assaults or threats of physical violence directed at discouraging [union] membership". [116 F. 2d 311.] There, however, the company had evidenced a bitter hostility toward the union and had committed a number of unfair labor practices directed at its members. Employees opposed to the union were evicted by union members from the plant without any effort being made by the management or the plant police to stop it, but it must be noted that such evictions were made not only from plant property and in the presence of supervisory employees but "that foremen, assistant foremen, and others occupying a supervisory capacity, sometimes directly participated in the evictions". 116 F.2d at page 310. It was in such a setting that this court approved an order requiring the company to protect its employees.

In the Reliance case, this court approved the Board's conclusion "that the acts of the non-union employees had the approval of [the company's] supervisory employees" [125 F.2d 319] and enforced the Board's reinstatement order which rested on the finding that respondent "by aiding and condoning the lock-out" had violated Sec. 8(a) (3) of the Act. There, the aggrieved employees (members of the union) were attacked by other employees (non-union members) and refused admittance to company property. Again, a reading of the opinion discloses the company's hostility toward the union and that its supervisory employees actively took part in the organization of a company union, borrowed money from the employer for that purpose and did numerous things to show affirmatively employer participation in the discriminatory activities.

Neither of these cases nor any of the others relied upon furnish any support for the Board's conclusion that the company was guilty of an unfair labor practice. It is only by extracting a statement here and there out of context and by ignoring the facts with reference to which such statements were made that the Board attempts to sustain its position. There is no case, so far as we are aware, and certainly none cited by the Board, where an employer has been held guilty of an unfair labor practice in the absence of a finding or proof of hostility toward the union or the employee alleged to have been discriminated against, in the absence of any affirmative discriminatory act or statement by the employer or its representative, or in the absence of a refusal on the part of an employer, upon request, to take some action required by the Act. Notwithstanding an entire absence of proof in all these respects, the Board found that the company "constructively" discharged Chandler and Smith in violation of Sec. 8(a) (3) on the premise that it had knowledge of the threatening and coercive activities of the Union officials and that by its failure to disavow the same it acquiesced therein.

Preliminary to a discussion of the Board's theory, a further brief statement appears to be in order. As already noted, the company during the period relevant to this proceeding was operating its mine under a contract with the petitioner Unions. It appears that there was considerable feeling among members of the petitioner Local, especially among the older members, that they could be better represented by the United Mine Workers of America, a rival labor organization. Because of this dissension, there had previously been wildcat strikes and work stoppages. It was in this setting that Chandler and Smith on March 24, 1948, as heretofore noted, left their work at the mine for the purpose of visiting the office of the rival union. And it was this dissension no doubt which furnished the excuse for the threatening and coercive statements directed at Chandler and Smith by officials of the Progressive Union. It must be kept in mind that all of such threatening and coercive statements, with certain minor exceptions, were made far removed from the property of the company, mostly at the home of either Chandler or Smith, and that none of such statements was made in the presence or hearing of any company official. There is proof, not disputed, that the company exhibited neither hostility nor favoritism on behalf of or against either of the rival unions. The company was interested in mining coal, without interruptions and work stoppages, and so far as the evidence shows was not concerned with which union its employees selected as their bargaining agent.

Chandler on March 25, 1948 returned to the mine for work but after a conversation with certain of the Union officials left, apparently voluntarily, for the purpose of going to the home of Smith. As the Trial Examiner stated, "Chandler did not report for work again; he went to the mine on two other occasions, once to receive his pay check and on another occasion, approximately 1 month later, to pick up his working clothes. He apparently did not converse on either occasion with any of Respondent Company's supervisory officials about returning to work and at no other time did he attempt to communicate with them."

Smith intended to return to work on March 25, 1948, but on the evening before received an invitation, which he accepted, to attend a memorial sponsored by a veterans' association of which he was a member, and as the Examiner stated, "Smith did not report for work again at the mine. In fact, he did not communicate with any supervisory officials of Respondent Company until over three months later, on June 30, when he went to the mine, which was closed down that day, to collect a check covering his vacation pay."

Thus, neither Chandler nor Smith returned to the mine for work, nor did they make any attempt or effort so to do. Neither ever made any complaint to or notified the company as to why they did not return, neither of them made known to the company a desire to exercise their right to work

and neither of them requested that the company protect them in the exercise of such right. True, they testified that their failure to return to their jobs was because of the threats which had been made against them by Union officials. But this does not explain their failure to notify the company of their predicament and their failure to request protection if they desired to work. Smith in particular had ample opportunity to notify the company inasmuch as he had a telephone in his home, and on several occasions he saw mine manager Oliver on the streets of the city where Smith resided.

It is also undisputed that both Chandler and Smith remained upon the payroll records of the company as employees and that they continued to occupy such status insofar as the company was concerned. And there is no proof that the company was requested by the Unions or any of their officials to discriminate against Chandler and Smith by discharge or otherwise

The Board's theory based upon a "constructive" discharge we think is both novel and ingenious. The company was not charged with a "constructive" discharge. The complaint alleged that it "did discharge the employees," "has refused to reinstate them," and "did cause the Unions to restrain and coerce them." There was no finding that the company had refused to reinstate them, as evidently there could not be in the absence of a request by the employees. The Board conceded that there was no evidence that the company caused the Unions to restrain and coerce them, and should have conceded, so we think, as did the Trial Examiner, that there was as a matter of fact no discharge by the company of these employees. Whether this "constructive" discharge theory is within the contemplation of the Act we need not decide. Its use, however, demonstrates the extreme position to which the Board is driven in view of the allegations of its complaint and the uncontroverted facts.

The Board found that the company had knowledge of the unfair labor practices committed by the Unions but, as already noted, also found that there was no suffi-cient proof that such activities were instigated or inspired by the company. The controversy here largely turns upon the issue as to whether the Board's finding of knowledge is substantially supported. In our view, a more serious question is whether the company committed an unfair labor practice even though it had such knowledge. As already noted, no case has so held under a state of facts fairly comparable to those of the instant case. On what theory an employer may be held liable for an unfair labor practice perpetrated by a union or its officials, in the absence of any assistence, encouragement or collaboration, is not discernible to us. In theory at least, the employer and the union occupy adverse positions and neither, in our view, is liable for the acts of the other where each is pursuing its independent course. The company had no means of preventing the proscribed activities on the part of the Unions and it was without authority to punish, chastise or reprimand the Unions and their officials for their activities. Any action which it might have taken along this line would in all probability have been branded as an unfair labor practice against the Unions.

It is argued, however, that the company was under a duty to protect the right of Chandler and Smith to work. But what kind of protection, as well as when and where was the company under such a duty? Certainly it was under no duty to furnish them protection in their homes or while traveling on the streets and highways of the communities in which they resided. Nor do we think the company was under any duty to urge them to return to work. Any move by the company along this line would in all probability have been provocative of more serious trouble, resulting in further work stoppages. This is not to say that an employer is never under a duty to protect an employee in his right to work. The company would have been presented with a different situation had Chandler and Smith sought to exercise that right by reporting for work. This they failed to do. And more than that, as already shown, they made no complaint to the company relative to their situation and no request for pro-

tection, either in person, by mail, telephone or otherwise. Their employment relationship was not severed and their jobs, so far as the company was concerned, remained open to them. Undoubtedly the company was in a delicate position, likely to be engulfed in a labor controversy for which it was not responsible and over which it had no control. And we think it is entitled to be commended rather than castigated for the restraint which it exercised.

█ Thus, on the assumption that the company had knowledge of the unfair labor activities practiced by the Unions, we hold that it was not under the circumstances of the case guilty of any unfair labor practice, but in doing so we have indulged in an assumption against the company which is a highly controverted issue. The company denies that it had such knowledge, and both the Examiner and the two dissenting members of the Board found that there was no substantial evidence that it did. In view of what we have said, it is hardly necessary to follow the Board in the numerous incidents which it relates, admittedly which do not show actual knowledge but from which the Board infers knowledge. Therefore, a brief summary of such incidents will suffice.

The Board in its brief states and restates the theme that "the company itself set in motion the chain of events which culminated in this litigation." Thus the Board's argument proceeds upon a premise which we think is false. The chain of events was set in motion by Chandler and Smith. On the morning of March 24, they went down into the mine to work as usual. After talking to some of their fellow employees they decided not to work and to make a trip to Duquoin, Illinois, for the purpose of conferring with the officials of a rival union. Mine manager Oliver incidentally met them near the bottom of the shaft and inquired why they were leaving. Their answer was that they did not feel like working. Oliver shortly afterwards met Todd, the Union president, and reported the incident to him. Chandler and Smith carried out their purpose and went to Duquoin. Thus, the chain of events was initiated. We assume that

Chandler and Smith had a legal right to leave their employment under such circumstances and even to state falsely their reason for so doing. That both Oliver, as superintendent of the company's mine, and Todd, the president of the Local with whom it had a contract, had a natural and legitimate interest in the sudden departure of these two men would seem evident, and the fact that their absence was reported to Todd furnishes no basis for the Board's inference that the purpose "was to stir this Union to action." And the inference is not strengthened, as the Board asserts, because in the conversation, Oliver suggested to Todd that he verify the rumor then prevalent in the mine that the purpose of their absence was to confer with the rival union. Another perfectly innocuous incident much relied upon by the Board is that pit boss Voitas, a supervisory employee (Oliver and Voitas are the sole supervisory employees mentioned in the testimony), on that evening had a conversation with a deputy sheriff which the Board describes as "alerting the police to the possibility of labor trouble at the mine the next day." The testimony of the deputy sheriff is to the effect that Voitas stated to him that there was some friction between the Unions, that they might have trouble, and if they did, the company wanted protection from the sheriff's office. The deputy sheriff promised that in case of violence somebody from the sheriff's office would come out.

On the morning of March 25, when Chandler accompanied a group of Union officials to the home of Smith, Voitas permitted a Union official the use of his car in driving to Smith's house. From this incident the Board infers that the company had knowledge that the "Union officials were threatening Chandler and Smith," but the record shows that it was not an unusual thing for Voitas to permit the use of his car by Union officials. This inference is made, so it is stated, "in the light of the events of the preceding day," which we suppose refers to the threats and coercive statements made by the members of the Unions out of the presence and hearing of the company officials. The Board relies upon another conversation between Ram-

sey, a Union representative, and Oliver, in which the latter was informed that the Unions had spoken with Chandler and Smith about their meeting with a rival union and that the two men had agreed to stay away from work "until the case was settled," by which was meant until the Unions at their next meeting could consider the dispute.

On June 30, 1948, Smith went to the mine to get his vacation pay and asked Oliver "if he fired [him] when Owens and Ramsey told him to." Oliver replied, "You ain't getting no information from me," and asked Smith, "Why ain't you working?" Smith referred Oliver for an answer to the question to Ramsey (a union official) who was standing some fifty yards away. This incident, so the Board says, "further evidenced the company's knowledge of, and acquiescence in, the Unions' action in ousting Chandler and Smith."

We have read the testimony relative to the various incidents which the Board relies upon to infer that the company had knowledge of the threatening and coercive activities of the Unions' officials. In our view, the inference which the Board makes ignores the realities of the situation and is of dubious validity, but if such an inference is accepted, it is of little benefit to the Board's theory because it must be further inferred that the company acquiesced in the Unions' unfair activities. And this second inference does not necessarily follow the first. Mere knowledge of wrongful conduct, according to our thinking, does not give rise to the inference that the person with such knowledge acquiesces therein. But that is not all. Even though it be inferred that the company had knowledge of the Unions' activities and inferred that it acquiesced therein, there must be the further inference, because there is no proof, that the company's acquiescence was for the purpose either of encouraging membership in the Progressive Mine Workers or discouraging membership in the United Mine Workers. Consistent with the general rule, this court has held that this is not permissible. Interlake Iron Corporation v. National Labor Relations Board, 7 Cir., 131

F.2d 129; Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 139 F. 2d 855, 859.

The Board's request for the enforcement of its order will be allowed insofar as it rests upon the conclusion that the Unions violated Sec. 8(b) (1) (A) and, derivatively, Sec. 7 of the Act. In all other respects its request for enforcement is denied. More particularly, that portion of the Board's order which rests upon its conclusion that the company constructively discharged employees Chandler and Smith in violation of Sec. 8(a) (3) and, derivatively, 8(a) (1) of the Act, and that portion of its order which rests upon its conclusion that the Unions violated Sec. 8 (b) (2) of the Act, are set aside.

Obviously, any decree entered in this proceeding must conform with what we have held. We think nothing further need be said in this respect, except it appears advisable to make disposition of that portion of the Board's order which directs the company and the Unions "jointly and severally to make the discriminatees whole for any loss of pay they may have suffered by reason of the discrimination against them * * *." Having denied enforcement of the Board's order as to the company, it follows that the order lastly quoted is not applicable to it. Having allowed enforcement of the Board's order against the Unions only as it pertains to a violation of Sec. 8(b) (1) (A), the question arises whether a back pay order can be made applicable to them.

Sec. 10(c) contains the Board's sole authority for directing back pay. It provides: "* * * and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him * * *." The Trial Examiner took the position that the Unions were not liable for back pay in the absence of a violation by the Unions of Sec. 8(b) (2). The Board

did not reach the question for the reason that it found that the company violated Sec. 8(a) (3) and the Unions violated Sec. 8(b) (2). Now that we have held to the contrary, the question is posed as it was before the Examiner.

The Examiner cites in support of his position on this phase of the case Colonial Hardwood Flooring Company v. National Labor Relations Board, 84 N.L.R.B. 563, decided June 28, 1949. In that case, under circumstances similar to those here, the Board held it was without authority to enter an order against the unions indemnifying employees for any loss of earnings they may have suffered because of the unions' unfair labor practices. In doing so, the Board stated (page 565), "An award of back pay here would be in the nature of damages to the employee for an interference with his right of ingress to the plant, as contrasted with compensation to him for losses in pay suffered by him because of severance of or interference with the tenure or terms of the employment relationship between him and his employer in the ordinary case in which back pay is awarded and to which Section 10(c) of the Act has been held for many years to refer. The Act contains *no* provision authorizing the Board to require damages or back pay of a labor organization under such circumstances." As support for this statement, the Board cites in a footnote Matter of National Maritime Union of America, 78 N.L.R.B. 971, where the Board held "that it had no power to require damages of a labor organization responsible for unfair labor practices resulting in injury to certain employers."

We agree with the Trial Examiner that the Board's decision in the Colonial Hardwood Flooring Company case precludes the allowance of back pay under our decision. More than that, we are of the view that the Board in that case properly held its lack of authority to make an award against the union under such circumstances. Therefore, that portion of the Board's order which requires back pay either by the company or the Unions, or both, is set aside.