INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, AFL–CIO, LOCAL NO. 111, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 85–1194.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1986.

Decided June 10, 1986.

---

Roger N. Gold, Chicago, Ill., for petitioner.

John G. Elligers, Atty., N.L.R.B., with whom Elliott Moore, Deputy Associate Gen. Counsel, and John H. Ferguson, Atty., N.L.R.B., Washington, D.C., were on brief, for respondent.

Before SCALIA and SILBERMAN, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SCALIA.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

SCALIA, Circuit Judge:

Section 8(b)(1)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A) (1982), makes it an unfair

labor practice for unions to coerce employees in the exercise of their right to refrain from union activity. Section 8(b)(2), 29 U.S.C. § 158(b)(2), makes it an unfair labor practice for unions to attempt to cause employers to discriminate among employees in order to encourage union membership. Petitioner ("Local 111") seeks review of the Board's ruling that it violated § 8(b)(1)(A) by forcing non-Local workers to cease working; and that it violated § 8(b)(2) both by the indirect coercion to fire non-Local workers which the union-forced absences would produce, and by direct requests that the employer lay off non-Local workers and replace them with Local members. The issues presented are whether the Board's findings of unfair labor practices are supported by substantial evidence, and, if so, whether the Board acted unlawfully in ordering Local 111 to compensate non-Local workers for wages lost as a result of yielding to the union pressure to refrain from work but not as a result of any action taken by the employer at the union's instance.

## I

The stipulated facts in the present case were as follows: Local 111, an affiliate of the International Association of Bridge, Structural and Ornamental Iron Workers ("IABSOIW"), was the collective bargaining representative for iron workers employed by Northern States Steel Builders, Inc. ("NSSB") at the Louisa Generating Station project in Muscatine, Iowa. As of January 1, 1982, NSSB employed twenty iron workers on the project, only three of whom were members of Local 111. The remaining seventeen were "travelers," *i.e.*, members of other locals affiliated with the IABSOIW. Travelers are required by the IABSOIW constitution to pay "travel service dues" of $2.50 per week to the local in whose jurisdiction they work, to pay monthly union dues to their home local, and to have available for inspection receipts establishing that they have done so.

Between January 11 and January 29, 1982, Local 111 refused to accept properly tendered travel service dues from certain of the travelers working on the Louisa project. On January 18, Local 111's Steward told travelers that the Local was not forbidding them to work, but that travelers whose travel service dues had not been accepted would be subject to internal union charges if they worked. The next day, NSSB's Superintendent told all of the iron workers that NSSB had work for them and would like them to perform it, but that NSSB understood there was a dispute between the travelers and Local 111 and would not lay off travelers who did not work. On January 20, Local 111's Steward said that no internal union charges would be preferred against travelers who worked; but five days later he told ten travelers that if they worked they would be subject to internal union charges.

On January 28, the day after one of the travelers filed an unfair labor practice charge with the Board, Local 111 received a telegram from the IABSOIW directing it to accept travel service dues. Local 111 then informed the travelers that it would accept travel service dues from those who could document their payment of monthly dues to their home local. All but one traveler, Sylvan Hoiness, provided the necessary documentation by February 1. On January 29, Hoiness asked Local 111 to call his home local to confirm that he had paid his monthly dues. Local 111 refused. On February 2, Hoiness proffered a telegram indicating that he had wired payment of his monthly dues to his home local. Local 111 did not accept the telegram as verification, and again refused to call Hoiness's home local. On February 3, Hoiness went back to work for NSSB even though Local 111 refused to accept his tendered travel service dues and threatened to prefer internal union charges against him if he worked. No charges were ever brought, however, and on February 22 Hoiness's home local called Local 111 to confirm that Hoiness had paid his monthly dues. Local 111 thereafter accepted Hoiness's tender of travel service dues.

During the January 11–29 period when travel service dues were being rejected, the following additional events occurred: On January 11 and again on January 29, Local 111's Business Manager asked NSSB's Superintendent to hire Local members. Both times, the Superintendent refused, saying that NSSB needed no additional workers. On a number of occasions, Local 111's Steward asked the Superintendent to give him a "layoff list" of NSSB iron workers. The Superintendent responded that NSSB had no such list and did not intend to lay off any of its iron workers. On January 13, Local 111's Business Manager asked certain travelers to quit so that unemployed Local members could replace them. The Business Manager also told two of the travelers that he would ask NSSB to lay off travelers so that they would be eligible for unemployment compensation.

The unfair labor practice complaint that is the subject of this appeal was issued by the Director of Board Region 33 on February 23, 1982. The parties submitted the case on a stipulated record, and on March 6, 1985 the Board issued its Decision and Order. *International Association of Bridge, Structural & Ornamental Iron Workers, Local No. 111 (Northern States Steel Builders, Inc.)*, 274 N.L.R.B. No. 110. The Board found that Local 111 had violated § 8(b)(1)(A) of the NLRA by refusing to accept properly tendered travel service dues and attempting to coerce travelers to quit so that Local members could replace them. The Board also found that Local 111 had violated § 8(b)(2) of the NLRA, by attempting to prevent travelers from working in order to pressure NSSB to replace them with Local members, and by repeatedly asking NSSB to draw up "layoff lists" and to hire Local members even though it was apparent that NSSB had no plans to lay off current employees or hire new workers. In addition to issuing a cease-and-desist order and requiring the posting of notices, the Board ordered Local 111 to pay the lost wages of the travelers who missed work as a result of Local 111's unfair labor practices.

Pursuant to 29 U.S.C. § 160(f) (1982), Local 111 filed the present petition for review, challenging the Board's findings that it had engaged in unfair labor practices and the Board's order that it compensate travelers for lost pay. The Board filed a cross-application for enforcement of its order. *See* 29 U.S.C. § 160(e); FED.R.APP.P. 15(b).

**II**

■ Although the Board found that Local 111 violated § 8(b)(1)(A) in a number of ways, Local 111 contests only the violation based on its refusal to accept Sylvan Hoiness's tender of travel service dues from January 29, 1982 until February 22, 1982. It is uncontested that Hoiness did not have a receipt from his home local indicating that he had paid his monthly dues, as was required by the IABSOIW constitution. The Board held, however, that Local 111's refusal to accept the alternative verification offered by Hoiness was an unfair labor practice, because in comparable cases Local 111 had waived strict enforcement of the verification requirement and had declined to do so here merely because it wished to secure Hoiness's job for one of its members. Local 111 attacks this holding on the ground that, although it had waived the verification requirement on occasion, it had never done so in circumstances comparable to those of this case.

It was stipulated that during some periods Local 111 did not consistently require travelers to verify payment of dues to their home locals. Moreover, when Local 111 did require verification, it frequently accepted telephone calls from home locals as sufficient. Finally, on occasion Local 111 temporarily waived the dues-payment requirement for travelers who had financial emergencies. Although the union accurately notes the absence of evidence that it had ever made (rather than received) a telephone call or accepted a telegram to verify dues payment, there is a difference between comparability and identity, and only the former is needed. We have no basis for disturbing the Board's judgment

that Local 111's behavior toward Hoiness was an improperly motivated deviation from what had otherwise been lenient enforcement of the verification requirement. *See* 29 U.S.C. § 160(f) (Board's findings are conclusive if supported by substantial evidence on the record considered as a whole). Since Local 111 did not dispute that such a deviation, if shown, would constitute an unfair labor practice, we must affirm the Board on this issue.

## III

The Board concluded that Local 111 committed two separate violations of § 8(b)(2), one indirect and one direct. The indirect violation consisted of some of the same acts that constituted the § 8(b)(1)(A) violation, namely Local 111's effort to make the travelers miss work, which the Board concluded was designed to force NSSB to replace them with Local members. The direct § 8(b)(2) violation consisted of the union's repeated requests that NSSB draw up "layoff lists" and hire Local members, which under the circumstances constituted, in the Board's view, requests to dismiss the travelers.

■ Local 111 objects to the former—the separate violation of "indirect coercion" of the employer through pressure on the travelers—on the ground that it was neither included in the General Counsel's complaint nor litigated by the parties, and thus cannot properly be found. *See NLRB v. Blake Construction Co.*, 663 F.2d 272 (D.C.Cir. 1981). The Board responds that all of the factual elements necessary to sustain the "indirect coercion" theory were included in the complaint and supported by the stipulation; that Local 111 therefore had adequate notice of, and opportunity to litigate, the theory; and that Local 111 has not suggested that it was in any way prejudiced by failure to set forth the theory explicitly in the complaint. We think these responses inadequate. *Blake Construction* forbids the Board to "make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent hearing." 663

F.2d at 279. It is clear that the "indirect coercion" violation was not charged in the complaint, which, in specifying with great precision the conduct alleged to violate § 8(b)(2), made no mention of Local 111's behavior toward the travelers or of the indirect effect of that behavior on NSSB. Since the Board does not contend that the "indirect coercion" violation was actually litigated at any point during the course of the abbreviated proceedings before the Board, the finding of that violation cannot be reconciled with the requirements of *Blake Construction.*

■ As to the second § 8(b)(2) violation, Local 111 argues that the record does not support the Board's conclusion that the union's direct dealings with NSSB were efforts to cause NSSB to discriminate against the travelers. It is true that, viewed in isolation, Local 111's repeated requests for the hiring of Local members or for the preparation of "layoff lists" could be thought innocuous. But when they are viewed in light of the fact that there was no reason to believe that NSSB had any reason either to hire or (except for union-procured absences) to fire; when it is considered that the two requests are inconsistent except as an invitation to fire some workers in order to hire others; and when there is added to all this the background of dispute between the travelers and Local 111, we see no reason to doubt the Board's judgment that these requests were efforts to cause NSSB to replace the travelers with Local members. Local 111 also contends that in two decisions the Board has declined to find a § 8(b)(2) violation on the basis of evidence stronger than that present in this case. *See IBEW, Local 71 (Wagner-Smith Co.)*, 223 N.L.R.B. 1155 (1976) (*"Wagner-Smith Co."*); *International Association of Heat & Frost Insulators, Local 84 (Edward R. Hart Co.)*, 146 N.L.R.B. 660 (1964) (*"Edward R. Hart Co."*). Assuming without deciding that a sufficiently egregious disparity in fact-finding, even with respect to a case more than twenty years old, would require us to set the Board's determination aside, we agree

with the Board that the evidence of violation in the two cases was less substantial than here. In both of them the allegedly unlawful union actions were significantly less extensive than the pattern evident in the present case. *See Wagner-Smith Co.,* 223 N.L.R.B. at 1156–57; *Edward R. Hart Co.,* 146 N.L.R.B. at 661. Moreover, in one of them it was doubtful whether the union had any improper intent at all. *Wagner-Smith Co.,* 223 N.L.R.B. at 1157.

## IV

■ Local 111's last objection is to the scope of the Board's remedial order. After the General Counsel asked the Board to order Local 111 to compensate travelers for lost wages, the union, in a sixteen-page section of its brief before the Board, vigorously disputed the appropriateness of such an order, making essentially the following arguments:

(1) Even if it is true that Local 111 *attempted* to cause NSSB to discriminate against the travelers, it did not succeed. The Board has held, in *In re United Furniture Workers (Colonial Hardwood Flooring Co.),* 84 N.L.R.B. 563, 565–66 (1949) ( *"Colonial Hardwood"*), that it lacks statutory authority to order unions to pay lost wages unless they are attributable to union-procured employer discrimination. Although the Board has in some cases relied on policy rather than statutory grounds to justify its rule against awarding back pay absent employer discrimination, *see, e.g., Union de Tronquistas, Local 901 (Lock Joint Pipe & Co.),* 202 N.L.R.B. 399, 399–400 (1973) (*"Lock Joint Pipe & Co."*); *International Union of Operating Engineers, Local 513 (Long Construction Co.),* 145 N.L.R.B. 554, 555–56 (1963) (*"Long Construction Co."*), the Board has never expressly disavowed, and therefore remains bound by, the conclusion that it lacks statutory authority to award back pay in the circumstances of this case.

(2) Even if the Board can properly treat the *Colonial Hardwood* rule as based solely on policy, that change in justification has never been explicitly linked to a change in the scope of the rule. Thus, the Board is foreclosed from awarding back pay even if *Colonial Hardwood* is taken to be justified solely on policy grounds.

(3) Although some of the cases in which the *Colonial Hardwood* rule was described as policy-based involved strike or picket violence, *see, e.g., Lock Joint Pipe & Co.; Long Construction Co.,* and thus some of the policy justifications advanced for the rule in those cases were applicable only in those circumstances, the Board has never stated that the rule was limited to those circumstances, and has frequently applied the rule in other circumstances. *See, e.g., Tower Hotel Co.,* 250 N.L.R.B. 99, 101–02 (1980); *Bricklayers, Local 6,* 185 N.L.R.B. 756, 762 (1970), *enf'd mem.,* 447 F.2d 484 (5th Cir.1971) (per curiam); *Edward R. Hart Co.,* 146 N.L.R.B. at 661–62.

(4) It would be arbitrary and capricious for the Board to limit the rule to cases involving strike or picket violence, since to do so would encourage unions to engage in such violence in order to avoid liability for back pay.

(5) Although the Board has deviated from the per se *Colonial Hardwood* rule in one case, *Sachs Electric Co.,* 248 N.L.R.B. 669 (1980), *enf'd in relevant part sub nom. NLRB v. IBEW, Local 453,* 668 F.2d 991, 995 (8th Cir.1982), it gave no explanation for doing so, and the question of the appropriateness of that deviation does not appear to have been pressed by the union involved. Moreover, *Sachs* is distinguishable from the instant case in a number of respects.

In its Decision and Order, the Board ordered Local 111 to pay the travelers' lost wages, without mentioning, much less responding to, these arguments against its authority to do so. In this petition for review, Local 111 renews its arguments and adds the charge that the Board's failure to address them violated that provision of the Administrative Procedure Act ("APA") which requires agencies to include

in their adjudicatory decisions a statement of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A) (1982).

In their brief, counsel for the Board—perhaps emulating their client's pauciloquy—did not address Local 111's APA argument, contenting themselves with making the responses to the union's substantive points which the Board could have (but did not) set forth. For example, counsel cited a number of additional cases in which the Board ordered unions to pay lost wages to victims of their unfair labor practices even though no employer discrimination occurred—although in none of these cases did the Board explain the apparent inconsistency with the *Colonial Hardwood* rule. *See IBEW, Local 175 (Duncan Electric Co.)*, 269 N.L.R.B. 691, 691, 695 (1984), enf'd, 760 F.2d 714 (6th Cir.1985); *Local 282, International Brotherhood of Teamsters (Transit-Mix Concrete Corp.)*, 267 N.L.R.B. 1130, 1131 (1983), enf'd, 740 F.2d 141 (2d Cir.1984); *United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 119 (Kamtech, Inc.)*, 264 N.L.R.B. 688, 694–95 (1982) (*"Kamtech, Inc."*), enf'd mem., 715 F.2d 578 (11th Cir.1983); *System Council T-6, IBEW*, 236 N.L.R.B. 1209, 1209–10 (1978), enf'd, 599 F.2d 5 (1st Cir.1979); *IBEW, Local 309 (R. Dron Electrical Co.)*, 212 N.L.R.B. 409, 416 (1974) (*"R. Dron Electrical Co."*). Counsel also correctly noted that this court has held that it is within the Board's statutory authority to order a union to pay for lost wages even in the absence of employer discrimination. *See Warehouse Union, Local 860 v. NLRB*, 652 F.2d 1022, 1025–26 (D.C.Cir.1981).

Without reciting the rest of Board counsel's substantive justifications, and without pausing to parse the facts of the many individual cases, suffice it to say that it may be possible to view the Board's case-law as an unexplained evolution from *Colonial Hardware* to what Board counsel urge was (at the time this case was decided) the NLRB rule, that back pay will always be awarded to those whose loss of work was the result of unfair labor practices directed against them by unions, unless the unfair labor practices occurred in connection with strike or picket violence; but that it is also possible to view the case law the way counsel for Local 111 suggest, as a lesser (though equally unexplained) evolution, to a rule that back pay will never be awarded against unions in the absence of union-secured employer discrimination except in failure-of-representation cases and cases in which a union operating an exclusive hiring hall discriminates or threatens to discriminate with respect to future referrals. (Neither theory succeeds in readily explaining *all* the recent cases. *See Tower Hotel Co.*, 250 N.L.R.B. at 101–02 (seemingly incompatible with Board counsel's theory); *Kamtech, Inc.*, 264 N.L.R.B. at 694–95 (seemingly incompatible with union counsel's theory); *System Council T-6, IBEW*, 236 N.L.R.B. at 1210 (same); *R. Dron Electrical Co.*, 212 N.L.R.B. at 416 (same).) Had the Board itself explained its prior cases as Board counsel has, we might well find its decision a rational one. But that does not suffice. The purpose of the APA requirement that there be included in the agency's decision the "conclusions, and the reasons or basis therefor, on all the material issues of ... law" is only secondarily to enable reviewing courts to discern irrationality. Its primary purpose is to impose a discipline upon the agency itself, assuring that it has undergone a process of reasoned decision-making rather than haphazardly reached a result that could (on one or another basis of analysis) be sustained. To achieve that primary purpose, counsel's "post hoc rationalization" of why the agency could have come out the way it did will not suffice. *See, e.g., Investment Co. Institute v. Camp*, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971). Of course, where the legal issue raised is insubstantial—where, for example, despite the litigant's claim there is no apparent conflict in earlier agency cases, or the precise nature of and reasons for subsequent departures from earlier cases are clear—

the issue would not be considered "material" within the meaning of the APA, or the failure to address it would come within the APA's exemption for harmless error, 5 U.S.C. § 706 (1982). But that cannot remotely be considered the case here. In the circumstances of this case, we think it was unquestionably incumbent upon the Board to explain why it did not consider its decision a departure from the principles established in its prior cases, or why it considered a departure appropriate.*

The case must therefore be remanded to the Board for further explanation of why, in the light of its prior case law, it decided to award lost wages against the union. In the process of developing that explanation it is of course free to decide that its initial determination on this point was in error.

\* \* \* \* \* \*

Local 111's petition for review is denied as to the Board's finding that Local 111 violated § 8(b)(1)(A) of the NLRA by attempting to force travelers to stop work so that they would be replaced by Local members; denied as to the Board's finding that Local 111 violated § 8(b)(2) of the NLRA by directly attempting to cause NSSB to lay off travelers; granted as to the Board's finding that Local 111 violated § 8(b)(2) by using pressure on the travelers to indirectly coerce NSSB; and granted as to the Board's order that Local 111 compensate travelers for back pay lost as a result of those violations. The Board's cross-application for enforcement is granted except as to the back-pay order, which is vacated and remanded to the Board for further proceedings consistent with this opinion, and the § 8(b)(2) violation premised on indirect

coercion, as to which enforcement is denied.

*So ordered.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

I concur in all parts of the majority opinion except Part IV, which rejects the Board's remedial order. I would also concur in that portion of the opinion—since I share the majority's concern about the Board's puzzling treatment over the years of the issue whether backpay can or should be awarded for Section 8(b)(1)(A) violations [1]—if I did not feel bound by *Warehouse Union, Local 860 v. NLRB,* 652 F.2d 1022 (D.C.Cir.1981).

Like the case before us now, *Warehouse Union* involved a Section 8(b)(1)(A) violation, there predicated on a breach of the duty of fair representation. I believe this case presents even *stronger* grounds than did *Warehouse Union* for a backpay remedy against the union. In *Warehouse Union,* the Board found that a union violated Section 8(b)(1)(A) by failing to advise clerical employees whom it represented of the employer's threat to eliminate all jobs in a particular clerical unit if the union insisted on a wage increase for the clericals equal to that demanded for the warehousemen. The employer agreed to the wage increase for the clericals, and after a postponement of several months (secured by the union) eliminated the clerical jobs.

Although twelve of the thirteen clericals were women, the Board refused to find that the union acted with a discriminatory motive. The Board nevertheless found a

---

\* The partial dissent believes that our action in this Part IV of our opinion is precluded by *Warehouse Union, Local 860 v. NLRB, supra,* which upheld a back-pay award. Perhaps that circuit precedent would prevent our holding that the Board has no authority to award back pay in the circumstances of this case. What we hold, however, is not that the Board has no authority, but that it violated 5 U.S.C. § 557(c)(3)(A) by failing to provide the union with an explanation of the apparent inconsistency between its decision to exercise the authority in the present case and its decisions to refrain from exercising the authority in earlier cases.

Even if the facts of *Warehouse Union* were on all fours with the present case (which they are not, since they included failure of representation, a distinction that Local 111 suggests is significant), the Board's failure to provide explanation was not considered in that opinion.

1. The Board found both Section 8(b)(1)(A) and Section 8(b)(2) violations. It predicated its backpay order on both, but the employees' loss of wages stems only from the Section 8(b)(1)(A) violation because the employer refused to cooperate with the union.

Section 8(b)(1)(A) violation. This court affirmed, reasoning that the union's failure to inform the clericals of the employer's threat breached its duty to those it represented even in the absence of a hostile motive.

Regarding the remedy, the Administrative Law Judge, whose opinion the Board adopted, said:

It is recognized that an 8(b)(2) violation is not alleged. It is further recognized that the record does not show *a direct causal relationship between Respondent's 8(b)(1)(A) violation and the loss of jobs suffered by clerical employees.* Finally, there is no way to know whether, had they been given by Respondent the information they were entitled to, the clerical employees would have adopted an all-or-nothing bargaining position, although such is most unlikely and unnatural. Nonetheless, those employees were entitled to make their own decision, and they were deprived of that right by Respondent's knowledgeable silence. Under such circumstances, the employees' plight was Respondent's intentional creation, and *equity demands* that Respondent remedy that dereliction. Consequently, it will be recommended that Respondent make whole all SB–4 clerical employees who lost their jobs on October 15, 1977, as a result of Respondent's unfair labor practices.

*Warehouse Union, Local 860 (The Emporium),* 236 N.L.R.B. 844, 851 (1978) (footnote omitted; emphasis added).

On appeal, this court summarily rejected the union's contention that the Board exceeded its remedial powers by awarding backpay against the union: "The Board is vested with broad remedial powers and our review is limited. A remedy may be overturned 'only if the relief ordered "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the purpose of the act." ' " 652 F.2d at 1025–26 (citations omitted). Here, by contrast, we uphold the NLRB's finding of a Section 8(b)(2) violation as well as a Section 8(b)(1)(A) violation, in which there was shown a hostile motive and a direct causal link between the union's Section 8(b)(1)(A) violation and the loss of employment. The result in this case follows *a fortiori* from *Warehouse Union.* Having enforced a backpay remedy predicated solely on a fair representation violation in *Warehouse Union,* we no longer write on a clean slate. Since I believe a prior opinion of this court controls the disposition of this case, I am obliged to dissent as to the majority's rejection of the Board's remedy.[2]

---

**2.** That being said, I should add that I have strong misgivings about the soundness of *Warehouse Union.* Indeed, I share the view expressed by counsel for petitioner at oral argument, *i.e.,* that *Warehouse Union* seriously jeopardizes a union's ability to negotiate on behalf of those it represents. But until reversed *en banc,* that case remains the law of the Circuit.