INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL, AND ORNA-
MENTAL IRONWORKERS, AFL–CIO,
LOCAL NO. 111, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 90–2684, 90–2981.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1991.

Decided Oct. 28, 1991.

Roger N. Gold, argued, Gold & Polansky, Chicago, Ill., for petitioner.

Elizabeth Kinney, N.L.R.B. Region 13, Chicago, Ill., Aileen A. Armstrong, David A. Fleischer, argued, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Glenn A. Zipp, N.L.R.B., Peoria, Ill., for respondent.

Before BAUER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

This case involves an important question of labor law and policy. Section 10(c) of the National Labor Relations Act (NLRA) provides the National Labor Relations Board (Board) with remedial authority to correct union or employer unfair labor practices. A proviso in section 10(c) states that the Board may require back pay of a union or an employer, when "responsible for the discrimination suffered by [the employee]." In 1949 the Board established a policy of not awarding a back pay remedy under section 10(c) against a union unless the union is responsible for *employer* action causing the employee to miss work or otherwise lose wages. This condition on union back pay remedies has not since been overruled, although the Board has awarded back pay against unions in a few situations without employer discrimination. The Board now wants to abandon the policy altogether, which it contends is not compelled by statute and is a matter within its discretion.

## I.

### A. *Background*

Because the Board's finding that Local 111 committed unfair labor practices has been reviewed, enforced and reported elsewhere, *International Ass'n of Bridge, Structural and Ornamental Ironworkers, AFL–CIO, Local No. 111 (Northern States Steel Builders, Inc.)*, 274 NLRB 742 (1985), *aff'd in part, remanded in part*, 792 F.2d 241 (D.C.Cir.1986), we review the facts only briefly. Northern States Steel Builders, Inc. (Northern States), a construction company, employed iron workers for a power plant construction project. Local 111, bargaining representative for Northern State's iron workers, referred workers for the job. Northern States hired twenty or so workers, many of whom were "travelers"— members of other locals affiliated with Local 111 through the international union. The constitution of the Iron Workers' International Union requires that travelers pay "travel service dues" of $2.50 per week and prove payment to the local where they work.

In early 1982, Local 111 attempted to improve its unemployed members' prospects by refusing to accept certain travelers' proof of dues payment, encouraging some travelers to resign to make room for unemployed Local 111 members and threatening internal union charges against travelers working without travel service dues receipts. The Board's first order found in these practices three section (b)(1)(A) unfair labor practices, 29 U.S.C. § 158(b)(1)(A) (1988), for (i) the union's refusal to accept properly tendered travel service dues from travelers, (ii) threats of intra-union charges and attempts to have Northern States discriminate against travelers, and (iii) encouragement of certain travelers to quit their jobs. 274 NLRB at 747. The Board also found two (b)(2) violations, 29 U.S.C. § 158(b)(2) (1988), for (i) threats of intra-union charges against travelers and attempts to pressure Northern States to lay off the travelers, and (ii) attempts to coerce travelers not to work, thereby indirectly pressuring the company to hire Local 111 workers. *Id.* (This "indirect pressure"

(b)(2) violation was reversed on review.) The Board concluded that some travelers missed days of work because of the union's actions and found no discrimination by Northern States. None of this is in dispute.

What is in dispute is the Board's remedy requiring Local 111 to pay back wages to the travelers who missed work because of the local's refusal to accept proof of properly paid dues. The back pay remedy against the union departed from the Board's general rule, first announced in *United Furniture Workers of Am., Local 472 (Colonial Hardwood Flooring, Inc.),* 84 NLRB 563 (1949), against awarding back pay for union unfair labor practices unless the employee thereby suffers discrimination by the employer. The Board has followed the rule in numerous cases since then. *E.g., Local 983, United Bhd. of Carpenters and Joiners of Am., AFL–CIO (O.W. Burke Co.),* 115 NLRB 1123, 1123 & n. 1, 1131 (1956); *United Mine Workers of Am. (Blue Diamond Coal Co.),* 143 NLRB 795, 807 & n. 25 (1963); *Local 235 Lithographer and Photoengravers Int'l Union (Henry Wurst, Inc.),* 187 NLRB 490, 491 & n. 5 (1970). On Local 111's petition for review, the United States Court of Appeals for the D.C. Circuit found that the Board had not explained the basis for its change and thereby violated the Administrative Procedure Act's requirement, under 5 U.S.C. § 557(c)(3)(A) (1982), that agencies provide a statement of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 792 F.2d at 247–48. Remanding, the court noted inconsistency in the Board's application of the rule since 1949, as in cases where the Board has ordered unions to pay lost wages without employer discrimination and without an explanation of *Colonial Hardwood. E.g., Sachs Elec. Co.,* 248 NLRB 669 (1980), *enf'd in relevant part sub nom. NLRB v. IBEW, Local 453,* 668 F.2d 991, 995 (8th Cir.1982). The court found it difficult to find a rule reconciling Board holdings in this area and held it "unquestionably incumbent upon the Board to explain why it did not consider its decision a departure from the principles established in its prior cases, or why it considered a departure appropriate." 792 F.2d at 248.[1]

## B. *The Board's Response*

The Board's subsequent order clearly abandoned the *Colonial Hardwood* rule:

[W]e state our disagreement with the *Colonial Hardwood* Board's holding that the denial of backpay ... is statutorily required. In our view, *Colonial Hardwood* has, sub silentio, been overruled by subsequent decisions of the Board to the extent it holds that we lack the statutory authority to award backpay in any cases in which the union's discrimination against members or employees results in a loss of pay but there has been no union-procured discrimination by the employers. To avoid any confusion, however, we hereby overrule *Colonial Hardwood* and its progeny insofar as they rest on the proposition that the Board lacks the power under the Act to provide backpay to employees victimized solely by union misconduct. We do not, however, disturb the Board's doctrine ... of declining to grant backpay awards for losses attributable to strike or picket line union misconduct directed against employees where there has been no employer culpability.

*International Ass'n of Bridge, Structural, and Ornamental Ironworkers, AFL–CIO, Local No. 111 (Northern States Steel Builders, Inc.),* 298 NLRB No. 129 (1990) (slip order at 4–5). The order first charts an evolution from *Colonial Hardwood*'s view that back pay awards are not authorized by the NLRA to subsequent cases' view that, *see Operating Engineers Local 513 (Long Construction),* 145 NLRB 554 (1963); *Union de Tronquistas de Puerto*

---

1. One judge dissented from the remand, contending that the D.C.Circuit in *Warehouse Union, Local 860 v. NLRB,* 652 F.2d 1022 (D.C.Cir. 1981), had already endorsed the principle that the Board was entitled to grant a back pay remedy in this context. *Id.* at 248–49 (Silberman, J., concurring in part and dissenting in part).

*Rico, Local 901 (Lock Joint Pipe)*, 202 NLRB 399, 399–400 & n. 3 (1973), the rule reflects a policy choice and not statutory mandate. It then justifies the remedy as a means of encouraging employees to exercise their statutory rights, of providing a remedy to complement remedies against employers and of restoring injured employees to the "status quo ante." The order points out that several Board decisions have authorized back pay awards without employer discrimination and concludes that section 10(c) does not bar its new policy, which involves overruling any inconsistent opinions.[2] Local 111 petitions for review and the Board cross-petitions for enforcement.

## II.

■ The Board promulgated the new rule within its perceived discretion under 29 U.S.C. § 160(c). Our standard of review is deferential in recognition of Congress' delegation to the NLRB of primary responsibility for national labor policy, *see NLRB v. Manitowoc Eng'g Co.*, 909 F.2d 963, 971 n. 10 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991), but we will not enforce Board orders "where they ha[ve] 'no reasonable basis in law' either because the proper legal standard [is] not applied or because the Board applie[s] the correct standard but fail[s] to give the plain language of the standard its ordinary meaning." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (quoting *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971)). We will also overturn a Board order that is " 'fundamentally inconsistent with the structure of the [NLRA]' and an attempt to usurp 'major policy decisions properly made by Congress.' " *Id.* (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967,

13 L.Ed.2d 855 (1964)). As the Board's new policy rests on an interpretation of its statutory mandate, we examine whether the Board's rule conflicts with statutory language, legislative history or subsequent court interpretations. When the Board's interpretation is not precluded by statutory language or clear congressional intent, we must honor it if not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The union makes five arguments against the new rule. We take each in turn.

### A. *Statutory Language*

■ Local 111 first argues that the Board rule conflicts with the language of section 10(c), which provides in relevant part:

> If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such persons an order requiring such person to cease and desist from such unfair labor practice and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by [the employee]. . . .

29 U.S.C. § 160(c) (1988). Local 111 argues that the section's grant of general authority for "such affirmative action" is limited by the proviso's requirement that back pay accompany a finding of employer discrimination.[3] In addition, the union claims that

**2.** The Board limits its new rule to situations other than strike or picket line activity, where the no back pay rule remains in force. We therefore do not address the propriety of back pay awards in such settings. Because *Colonial Hardwood* involved a strike situation, the

Board's new policy therefore narrows the rule rather than overruling it entirely.

**3.** Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment, to en-

to read section 10(c) without the proviso as authorizing back pay for all union unfair labor practices—involving discrimination or otherwise—renders the proviso superfluous, in violation of an accepted canon of statutory construction. *Nieto v. Ecker,* 845 F.2d 868, 873 (9th Cir.1988); *Zimmerman v. North Am. Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983).

The argument is not persuasive. The plain language of section 10(c) grants the Board broad remedial powers, provided the remedy is consistent with the goals of the NLRA. *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 215–16, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964) (citing *Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)). The main body of the section explicitly authorizes "reinstatement of employees with or without back pay," providing the Board with authority to promulgate its new rule, and the proviso clarifies that even when the Board orders a remedy of reinstatement to the employer, the union is not exempt from a back pay remedy. *See generally In re H. Milton Newman,* 85 NLRB 725, 732 (1949) (describing history). Finally, we note that the Board's *Colonial Hardwood* interpretation of the statute has been questioned by reviewing courts, although not overturned. *See Drobena v. NLRB,* 612 F.2d 1095, 1098 (8th Cir.), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 23 (1980); *National Cash Register Co. v. NLRB,* 466 F.2d 945, 966–67 (6th Cir.1972), *cert. denied,* 410 U.S. 966, 93 S.Ct. 1442, 35 L.Ed.2d 700 (1973).

The proviso is not rendered superfluous. Without it, the statute could be interpreted as limiting back pay remedies to the employer. Since only the employer could be the subject of a reinstatement order, the "with or without back pay" provision could

be read as applying only to the employer as well. The proviso makes clear that the union responsible for the discrimination may also be responsible for back wages. But this need not limit the Board's authority when the union alone is responsible for missed work. Moreover, to the extent the proviso emphasizes what is contained in the general grant, this is consistent with the statute's assurance of the Board's broad remedial authority.

### B. *Legislative History*

■ The Labor Management Relations Act of 1947 added union unfair labor practices to the NLRA. The act also amended section 10(c) by adding the portion quoted above. Local 111 claims that the proceedings leading to section 10(c)'s passage support its interpretation.

The House originally passed its own version of section 10(c),[4] but the Senate amended it to its current form. Recommending the Senate version, the Conference Report contained this discussion:

> The Senate amendment ... did contain a provision authorizing the Board to require a labor organization to pay back pay to employees when the labor organization was responsible for the discrimination suffered by the employees.

H.R.Rep. No. 510, 80th Cong., 1st Sess. 54 (1947), *Legislative History* at 558. It continued:

> The language in the Senate amendment without which the Board could not require unions to pay back pay when they induce an employer to discriminate against an employee is included in the conference report.

*Id.* Local 111 argues that this demonstrates the House's belief that section 10(c) authorizes union back pay orders only

---

courage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3) (1988).

**4.** The House version provided that the Board could:

(c) ... take such affirmative action requested in the complaint (which in the case of unfair labor practices under Section 8(a) may include reinstatement of employees with or without back pay, and in the case of unfair

labor practices under Section 8(b) or 8(c) may include deprivation of rights under this Act for a period not exceeding one year) as will effectuate the policies of the Act.

H.R. 3020, 80th Cong., 1st Sess. § 10(c) (1947), *reprinted in* 1 NLRB, *Legislative History of the Labor–Management Relations Act of 1947,* at 195, 196 (1948) (hereinafter *Legislative History* ).

when the union causes employer discrimination.

However, other evidence from the legislative record casts doubt on this reading. First, the House report could also be read as clarifying that back pay can be assessed against a union even where the employer takes the action causing the employee harm. Given that the main body of the section includes "with or without back pay," the proviso clarifies that an order directing employer action—reinstatement—need not, in the case of union culpability, be "without back pay." In *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), the Supreme Court assessed whether Congress' authorization of "reinstatement of employees with or without back pay" precluded a back pay award without reinstatement. The Court stated:

> To attribute such a function to the participial phrase introduced by "including" is to shrivel a versatile principle to an illustrative application. We find no justification whatever for attributing to Congress such a casuistic withdrawal of the authority which, but for the illustration, it clearly has given the Board. The word "including" does not lend itself to such destructive significance.

313 U.S. at 189, 61 S.Ct. at 850 (citing *Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125, 55 S.Ct. 60, 61, 79 L.Ed. 232 (1934)). And in 1954 the Court answered the same question with respect to the proviso. It stated:

> Nor does the absence of joinder of the employer preclude entry of a back-pay order against the union.... In *Phelps Dodge Corp. v. Labor Board*, 313 U.S. 177, 189 [61 S.Ct. 845, 850], we interpret-

ed the phrase giving the Board power to order "reinstatement of employees with or without back pay" not to limit, but merely to illustrate, the general grant of power to award affirmative relief. Thus we held that the Board could order back pay without ordering reinstatement. The proviso in § 10(c) was added by the 1947 amendments. The purpose of Congress in enacting this provision was not to limit the power of the Board to order back pay without ordering reinstatement but to give the Board power to remedy union unfair labor practices *comparable to the power it possessed to remedy unfair labor practices by employers.*

*Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 54, 74 S.Ct. 323, 343, 98 L.Ed. 455 (1954) (citations omitted) (emphasis added).[5] Second, the Senate report shows no intent to limit back pay remedies to employer-induced unfair labor practices:

> Back pay may be required of either the employer or the labor organization, depending upon which is responsible for the discrimination suffered by the employee.

S.Rep. 105, 80th Cong., 1st Sess. 26 (1947), *Legislative History* at 404, 432. The report does not explicitly restrict back pay to instances of (employer) discrimination and is consistent with a view that back pay can also be awarded in situations other than discrimination—such as union-only unfair labor practices.

These legislative comments—cryptic as they are—indicate at least that Congress intended the Board to have power to remedy union unfair labor practices similar to its power to remedy employer unfair labor

---

**5.** Parenthetically, we note that even though the House's original version of section 10(c) provided for a seemingly narrower remedy, *see supra* n. 4, the committee reporting on this narrower version of section 10(c) stated:

> [I]n language like that which is applicable to employers who violate section 8(a), [section 10(c)] authorizes the Board to order unions and their adherents who violate section 8(b) to cease and desist from their unfair labor practices and to take such affirmative action as will effectuate the policies of the act. The Board is authorized to deprive them of rights

under the act for a period of not more than 1 year. Under this clause the Board may also require a union to reimburse to an employee whom it causes to lose pay the amount he loses.

H.R.Rep. 245, 80th Cong., 1st Sess. 42 (1947), *Legislative History* at 292, 333. If the narrow language of H.R. 3020 permits a union back pay remedy, by implication the admittedly broader version of 10(c) includes it as well, although we accept the later House report as a more authoritative interpretation of the bills' relationship.

practices. Moreover, nothing cited by the union can fairly be read to preclude back pay awards in this context.

## C. *Contemporaneous Construction in* Colonial Hardwood

■ Local 111 next contends that the Board's rule in *Colonial Hardwood* should still control because it closely followed the enactment of section 10(c). The contemporary construction doctrine holds that emphasis should be accorded "a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (citation omitted); *see also Power Reactor Dev. Co. v. International Union of Elec., Radio and Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). In the labor context, the D.C. Circuit has held that "courts [must] defer to an agency's contemporaneous construction of an amended statute unless, of course, the interpretation clearly conflicts with the intent of Congress." *International Bhd. of Elec. Workers, Local 474 v. NLRB,* 814 F.2d 697, 714 (D.C.Cir. 1987).

This argument suffers two flaws. First, whatever weight a contemporary construction is due, it cannot encroach on the scope of an agency's discretion to revise a rule in light of experience. *See NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975); *International Bhd.,* 814 F.2d at 719 (Buckley, J., concurring) ("The rationale for special deference to a *contemporaneous* construction is to aid courts in construing ambiguous statutory language and does not operate when the NLRB, in light of eleven years' experience applying the Act ..., overturns a prior construction of its organic statute in favor of a new permissible construction."); *Columbia Broadcasting System,*

*Inc. v. FCC,* 454 F.2d 1018, 1026 (D.C.Cir. 1971). We have held:

> It is also clear that the Board's previous decisions do not bind it in later proceedings with anything like the force of the doctrine of stare decisis in the courts. The Board is free to change its mind on matters of law that are within its competence to determine, provided it gives a reasoned analysis in support of the change. *See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29 [103 S.Ct. 2856, 77 L.Ed.2d 443] (1983); *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1093 (7th Cir. 1984).... Even if the Board adopts a rule in a decision that is subsequently enforced by a court of appeals, it may later change the rule. Enforcement reflects only a determination by the court of appeals that the rule is rational and consistent with the Act, not that it is the uniquely correct rule.

*Local 1384, United Automobile, Aerospace and Agricultural Implement Workers of Am., UAW v. NLRB,* 756 F.2d 482, 492 (7th Cir.1985); *see also Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792.

Second, an agency's contemporary construction commands less authority when, as here, it has subsequently been questioned, revised and in some cases seemingly disregarded. Some cases of union misconduct without employer discrimination have resulted in back pay orders despite *Colonial Hardwood. E.g., IBEW Local No. 175 (Duncan Elec. Co.),* 269 NLRB 691, 695 (1984), *enf'd,* 760 F.2d 714 (6th Cir.1985) (per curiam); *Sachs Elec. Co.,* 248 NLRB 669 (1980), *enf'd in relevant part sub nom. NLRB v. IBEW, Local 453,* 668 F.2d 991, 995 (8th Cir.1982); *System Council T–6, Int'l Bhd. of Elec. Workers, AFL–CIO (New England Tel. & Tel. Co.),* 236 NLRB 1209, 1210 (1978), *enf'd,* 599 F.2d 5 (1st Cir.1979). Earlier decisions, cited above, adhered to the rule.[6] And in *Ware-*

---

6. Others include *Bricklayers & Stone Masons, Local No. 6 (Linbeck Construction Co.),* 185 NLRB 756, 762 (1970) (finding discrimination), *enf'd,* 447 F.2d 484 (5th Cir.1971) (per curiam;

mem.); *American Guild of Variety Artists, AFL–CIO (Fontainebleau Hotel),* 163 NLRB 457, 458 (1967) (same); *International Ass'n of Heat & Frost Insulators & Asbestos Workers, Local No.*

*house Union, Local 860 v. NLRB*, 652 F.2d 1022 (D.C.Cir.1981), the court offered a potential expansion of the Board's authority when it provided, "It is not novel that a Union be required to reimburse an employee for backpay when its action resulted in the loss of the employee's job." 652 F.2d at 1026. Although the agency's vacillation on the matter presents its own (recurring) problems, the history of the rule convinces us that the original interpretation need not now command assent.

## D. Progressive Mine Workers v. NLRB

■ The union also argues that our endorsement of the *Colonial Hardwood* opinion in *Progressive Mine Workers v. NLRB*, 187 F.2d 298 (7th Cir.1951), prohibits the Board from now changing the rule. This is true only if we found the rule compelled by statute; otherwise, *Chevron* obligates us to defer to the agency's interpretation so long as it is a reasonable interpretation of the statute. *Progressive Mine Workers'* holding consists of this brief discussion:

> We agree with the Trial Examiner that the Board's decision in the *Colonial Hardwood Flooring Company* case precludes the allowance of back pay under our decision. More than that, we are of the view that the Board in that case properly held its lack of authority to make an award against the union under such circumstances.

187 F.2d at 307. This does not indicate whether the *Colonial Hardwood* rule was compelled by statute or was a matter of policy. In addition, unlike at the time of *Progressive Mine Workers*, agency shifts and even reversals of position are sometimes permitted in a post-*Chevron* world. Because we hold above that the Board's new rule does not violate statutory command or congressional intent, *Colonial Hardwood* must have been based on a reasonable rather than required construction of the act. The Board's revised interpretation of the Act is therefore entitled to deference.

*84 (Edward Hart Co.),* 146 NLRB 660, 661–62

## E. Congressional Inaction

■ Finally, the union contends that congressional inaction in the forty-two years since *Colonial Hardwood* implies legislative approval of the rule. To show that Congress considered the issue, Local 111 points to 1953 hearings before the House Committee on Education and Labor and the Senate Committee on Labor and Public Welfare. *Matters Relating to the Labor–Management Relations Act of 1947, and for Other Purposes: Hearings Before the House Comm. on Education and Labor,* 83d Cong., 1st Sess. (1953); *Proposed Revisions of the Labor Management Relations Act of 1947: Hearings Before the Senate Comm. on Labor and Public Welfare,* 83d Cong., 1st Sess. (1953). A statement by Powell C. Groner, Chairman of the Labor Relations Committee of the United States Chamber of Commerce, noted that the Board in the *Colonial Hardwood* decision "refused to hold a union liable for back pay losses suffered by employees, if the union's conduct consisted of violence, threats, mass picketing, or secondary boycotts, on the theory that the resultant losses were in the nature of damages rather than back pay, and that the union conduct was something other than discrimination." House Hearings (part 3) at 748. He suggested an amendment to provide that "loss of pay which results from any type of unfair labor practice specified in Section 8 of the National Labor Relations Act should be paid to the individual employee by the party deemed responsible." *Id.* However, the subsequently passed Labor Management Reporting and Disclosure Act of 1959, Pub.L. 86–257, 73 Stat. 519 (1959), contained no changes to section 10(c).

Initially, we note that the testimony appears to criticize primarily the Board's policy with respect to strikes and picket violence, a portion of the rule not at issue here. *See supra* note 2. Even if we construe the critique broadly, we are slow to read substantive content from congressional inaction. *Girouard v. United States,* 328 U.S. 61, 69, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946). Further, congressional inac-

(1964) (no discrimination).

tion here can be read as endorsement of the Board's exercise of discretion, especially considering the inconsistency in Board holdings on the subject. Finally, the Supreme Court indicated in another section 10(c) case that congressional silence should generally not be read as approval of a restriction in Board remedial authority:

> [I]f Congress had been more than satisfied with the Board's practice, if it had wanted to be certain that the Board would not in future profit by its experience, it would have had to do more than it did; it would have had to change the language of the statute so as to take from the Board the discretionary power to mould remedies suited to practical needs which we had declared the Board to have and which the Board was asserting and exercising. We cannot infer an intent to withdraw the grant of such power from what is at most a silent approval of specific exercises of it.

*NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 351–52, 73 S.Ct. 287, 291, 97 L.Ed. 377 (1953); *accord International Bhd. of Operative Potters, AFL–CIO v. NLRB*, 320 F.2d 757, 760 (D.C.Cir.1963) (congressional inaction not enough to endorse Board policy); *NLRB v. A.P.W. Prods. Co.*, 316 F.2d 899, 904–05 (2d Cir.1963) (reversal of policy not proscribed by twenty-six year congressional acquiescence) (Friendly, J.).

We interpret legislative inaction here as approval of the Board's policy-making role or as the absence of any intent. Without a stronger statement of congressional intent, we decline to read approval of *Colonial Hardwood*'s rule from Congress' inaction.

## III.

Local 111's petition for review is DENIED and the Board's cross-application for enforcement is GRANTED.